UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ELIZABETH JOANNE JABLONOWSKI,

                Plaintiff,

    -vs-                              **No. 1:14-CV-00541 (MAT)**
                                         **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

---

## I. Introduction

Represented by counsel, Elizabeth Joanne Jablonowski ("plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disabled adult child ("DAC") benefits and supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, plaintiff's motion is granted to the extent that this case is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## II. Procedural History

The record reveals that in October 2009 and March 2009, respectively, plaintiff (d/o/b December 12, 1991) applied for DAC and SSI benefits, alleging an amended onset date of disability as of December 12, 2009. After her applications were denied, plaintiff

requested a hearing, which was held before administrative law judge Robert Harvey ("the ALJ") on December 8, 2010. The ALJ issued an unfavorable decision on January 20, 2011.

On May 3, 2012, the Appeals Council reversed the ALJ's decision and remanded the matter with specific instructions, including instructions to give further consideration to plaintiff's maximum residual functional capacity ("RFC") and provide appropriate rationale with specific references to the record in support of the limitations, and to obtain vocational expert ("VE") testimony with regard to the extent of erosion of plaintiff's occupational base due to nonexertional limitations.

The ALJ held a second hearing on remand on September 20, 2012. He then issued a second unfavorable decision on October 9, 2012. The Appeals Council denied review of that decision and this timely action followed.

**III. Summary of the Evidence**

The record reveals that plaintiff suffered from a generalized seizure disorder. The earliest evidence of a seizure in the record occurred on May 26, 2008, when plaintiff had a seizure while asleep and exhibited symptoms of shaking, biting her tongue, and unresponsiveness. Following the episode, which lasted approximately five minutes, plaintiff was disoriented for about 25 minutes. Plaintiff subsequently suffered generalized tonic-clonic seizures on June 21, 2008; June 30, 2008; January 22, 2009; March 16, 2009; May 5, 2009; October 19, 2009; November 12, 2009; January 11, 2010; February 17, 2010; August 13, 2010; November 12, 2010; and

2

October 6, 2011. The Court notes that these are the seizures for which plaintiff sought medical treatment and not necessarily representative of every seizure plaintiff suffered within this time period. From January 23, 2012 through January 27, 2012, Dr. Susan Kerr conducted a long-term video EEG, during which plaintiff suffered one generalized tonic-clonic seizure.

Plaintiff's treating physician, Dr. E. Ann Yeh, completed two assessments of plaintiff's functioning. In the first, dated August 13, 2009, Dr. Yeh noted that she had been treating plaintiff, approximately every six months, since June 2006. Dr. Yeh stated that plaintiff suffered from generalized seizures on average once per month, with a typical seizure lasting approximately 15 minutes. According to Dr. Yeh, plaintiff did not always have a warning of an impending seizure and could not always take safety precautions prior to a seizure. Dr. Yeh stated that plaintiff had a history of injury and fecal or urinary incontinence during seizures, and she was currently prescribed trileptal, an anticonvulsant, but experienced occasional breakthrough seizures. Dr. Yeh recommended that during and immediately after a seizure, others should put something soft under plaintiff's head; remove her glasses; loosen tight clothing; clear the area of hard or sharp objects; and after seizure, turn plaintiff on her side to allow saliva to drain from her mouth. Plaintiff's postictal symptoms included confusion, exhaustion, irratibility, severe headache, and muscle strain.

In Dr. Yeh's opinion, plaintiff's seizures were likely to disrupt the work of coworkers and plaintiff would need more supervision at work than an unimpaired worker. Plaintiff suffered lack of alertness as a result of seizure medication, and she had memory problems associated with her condition. Dr. Yeh opined that plaintiff was capable of "low stress jobs" and that if she had a seizure, she would need to take unscheduled breaks in an eight-hour workday. Her condition was likely to cause "good days" and "bad days," and she would miss approximately one day per month from work. T. 834.

Dr. Yeh completed a second assessment on November 10, 2010. Dr. Yeh reported that plaintiff had zero to one seizure per month, each lasting approximately three minutes. Dr. Yeh stated that plaintiff's seizures may result in incapacitation for two to four hours following the seizure. Plaintiff was prescribed trileptal and Keppra, both anticonvulsant medications. Dr. Yeh once again wrote that plaintiff was capable of low stress jobs, but that she would miss about two days per month as a result of her condition.

**IV. The ALJ's Decision**

At step one of the five-step sequential evaluation, see 20 C.F.R. §§ 404.1520, 416.920, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 12, 2009, the amended alleged onset date. At step two, the ALJ found that plaintiff suffered from seizure disorder and learning disorder, both of which he considered severe. At step three, the

4

ALJ found that plaintiff's impairments did not meet or medically equal a listed impairment.

Before proceeding to step four, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except that she: could sit for up to two hours in an eight-hour workday; could stand or walk for up to six hours; could not work in an area with unprotected heights or around heavy, moving, or dangerous machinery; could not climb ropes, ladders, or scaffolds; had occasional limitations in the ability to understand, remember, and carry out detailed instructions and occasional limitations in the ability to maintain attention and concentration for an extended period; and retained the ability to perform the basic mental demands of unskilled work, including the ability to understand, remember, and carry out simple instructions, the ability to respond appropriately to supervision, coworkers, and usual work situations, and the ability to deal with changes in routine work settings.

At step four, the ALJ found that plaintiff had no past relevant work. At step five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, jobs existed in the national economy which plaintiff could perform. Accordingly, the ALJ found plaintiff not disabled.

**V. Discussion**

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual

5

findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

### A. Listing 12.05(C)

Plaintiff contends that the ALJ erred in failing to consider Listing 12.05(C) in his step three determination. At the time of the ALJ's decision, Listing 12.05(C) provided that a plaintiff was mentally retarded[1] (and therefore presumptively disabled) when she had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22," and when she had (1) "[a] valid verbal, performance, or full scale IQ of 60 through 70," and (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.05(C). Thus, "[t]o meet Listing 12.05(C), a claimant must satisfy the diagnostic description in the introductory paragraph of 12.05, and both prongs of section (C)." Kennerson v. Astrue, 2012 WL 3204055, *8 (W.D.N.Y. Aug. 3, 2012).

Plaintiff argues that she had a verbal IQ score of 70, which triggered the ALJ's responsibility to address Listing 12.05(C). The

---

[1] Listing 12.05(C) was amended in August 2013 to change the phrase "mental retardation" to "intellectual disability." That amendment did not change the substantive requirements of the listing.

6

record reveals, however, that this IQ score was not valid during the relevant time period. The score was noted in a school record dated February 10, 2009, wherein school psychologist Diana Buchholtz reported that in December 2005, plaintiff was assessed with a verbal IQ score of 70. As the Commissioner points out, this score was attained when plaintiff was 14 years old. Thus, under the regulations, it was valid for only two subsequent years. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00 (providing that "IQ test results obtained between ages 7 and 16 should be considered current for . . . 2 years when the IQ is 40 or above").

In contrast, the scores obtained in February 2009, when plaintiff was age 17, were valid IQ scores. See id. ("IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior."). The scores obtained on that date were a verbal score of 78, a nonverbal (performance) score of 74, and a full scale score of 75. Thus, the ALJ did not err in failing to specifically discuss Listing 12.05(C), because the evidence does not indicate that plaintiff qualified under that listing. See F.S. v. Astrue, 2012 WL 514944, *14 (N.D.N.Y. Feb. 15, 2012) ("[T]he ALJ's failure to discuss a listing is not reversible error if substantial evidence in the record indicates that plaintiff did not satisfy the listing.").

B. **Treating Physician Rule**

Plaintiff contends that the ALJ violated the treating physician rule by failing to give the requisite good reasons for

7

rejecting the opinions of her treating physician, Dr. Yeh. For the reasons set forth below, the Court agrees. The ALJ gave "some, but not great" weight to both of Dr. Yeh's opinions, finding that the "treatment notes [did] not support a seizure frequency of once per month . . ., and the dates of the claimant's most recent seizures . . . disprove a once-per-month frequency." T. 24. The ALJ further found that Dr. Yeh's statements were "internally inconsistent" because she indicated that plaintiff would miss up to one day per month in her first assessment, but in her second assessment noted that plaintiff "could miss up to two days of work per month, even though the claimant's seizures were less frequent." T. 24.

The treating physician rule provides that an ALJ must give controlling weight to a treating physician's opinion if that opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. §§ 404.1527, 416.927(c)(2). The regulations state that in evaluating a treating physician's opinion, the ALJ is to consider the following factors: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Halloran, 362 F.3d at 32.

8

The ALJ is required to give "good reasons" for rejecting a treating physician's opinion. See, e.g., Coluciello-Pitkouvich v. Astrue, 2014 WL 4954664, *6 (E.D.N.Y. Sept. 30, 2014) ("[T]he ALJ must expressly state the weight assigned and provide 'good reasons' for why the particular weight was assigned to each treating source's opinion.") (citing 20 C.F.R. § 404.1527(c)(2); Smith v. Colvin, 2013 WL 6504789, *11 (E.D.N.Y. Dec. 11, 2013) (noting that the district court must consider "whether the ALJ provided "good reasons" for discounting [a treating physician's] opinions *based on the factors set forth in the regulations*") (emphasis added)). In Halloran, the Second Circuit emphasized that it does "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion" because "opinions from ALJ[]s [must] comprehensively set forth reasons for the weight assigned to a treating physician's opinion." 362 F.3d at 32.

In this case, the ALJ failed to provide the requisite good reasons, based on the factors set forth in the regulations, for rejecting Dr. Yeh's opinions. The first reason the ALJ gave, as discussed above, was that substantial evidence in the record "disprove[d] a once-per-month frequency" with regard to plaintiff's seizures. T. 24. However, Dr. Yeh's second opinion actually stated that plaintiff suffered zero to one seizure per month. The record establishes that plaintiff had at least 14 seizures during the time period from May 2008 through January 2012. At the time Dr. Yeh gave his second opinion, the last three seizures plaintiff had suffered

9

occurred on January 11, 2010, February 17, 2010, and August 13, 2010. Thus, although the record does not, as the ALJ found, support a conclusion that plaintiff had a seizure frequency of once per month, as Dr. Yeh opined in his first opinion, it does support Dr. Yeh's second opinion that she had from zero to one seizure per month.

The only other reason the ALJ gave for rejecting Dr. Yeh's opinions was that the second was "internally inconsistent" with the first because Dr. Yeh indicated in the first that plaintiff would miss up to one day of work per month, but indicated in the second that plaintiff "could miss up to two days of work per month, even though the claimant's seizures were less frequent." T. 24. This does appear to reflect a minor inconsistency within the two opinions. However, this reason, along with the ALJ's conclusion that a "once-per-month frequency" of seizures was unsupported by the record, does not adequately explain why the ALJ rejected the balance of the restrictions opined by Dr. Yeh in her two opinions.

More significantly, the ALJ's discussion does not reference the factors laid out in the regulations for evaluation of a treating physician's opinion. It is thus not clear to the Court whether the ALJ actually considered these factors in arriving at his decision to give some, but not controlling, weight to Dr. Yeh's opinions. The Court therefore finds that the ALJ failed to properly apply the treating physician rule because he failed to give good reasons, based on the applicable factors, for rejecting Dr. Yeh's opinions. See Smith, 2013 WL 6504789 at *11.

The ALJ should have explained, with reference to the relevant factors, why he accepted or rejected the various portions of Dr. Yeh's opinions. As discussed above, Dr. Yeh opined that plaintiff had several work-related limitations, including that she would disrupt the work of coworkers and would require more supervision than an average worker, she had alertness and memory problems as a result of her condition, and she was capable of only low stress jobs. Although the ALJ found that plaintiff could "perform the basic mental demands of unskilled work," his RFC finding did not account for Dr. Yeh's opinion that plaintiff could handle only "low stress" jobs, and he failed to explain why he apparently rejected this portion of Dr. Yeh's opinion. Additionally, the ALJ failed to account for, or explain why he rejected, Dr. Yeh's findings that plaintiff would need additional supervision at the workplace and that she would disrupt coworkers. Ultimately, because the ALJ failed to adequately explain why he rejected Dr. Yeh's opinions, it is likewise unclear to the Court what evidence formed the basis of the ALJ's RFC finding.

This case is therefore remanded for the ALJ to reconsider Dr. Yeh's opinions. See, e.g., Pogozelski v. Barnhart, 2004 WL 1146059, *12 (E.D.N.Y. May 19, 2004) ("The failure to follow [the treating physician] rule, standing alone, requires [r]emand."). If the ALJ decides to give less than controlling weight to Dr. Yeh's opinions (or any portion thereof) on remand, he must give good reasons, with reference to the regulatory factors, for that decision. Additionally, on remand, the ALJ is directed to give

11

specific references to the record, including relevant opinion evidence, in support of the limitations found in the RFC. If the ALJ finds it necessary he should order a consulting examination in addition to reconsidering Dr. Yeh's opinions. See 20 C.F.R. §§ 404.1545, 416.945 (stating that the ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary"). The ALJ is also directed to obtain vocational expert testimony as to the degree to which plaintiff's occupational base would be eroded by her nonexertional limitations.

## VI. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 15) is denied and plaintiff's motion (Doc. 8) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**
HON. MICHAEL A. TELESCA
United States District Judge

Dated: June 9, 2017
Rochester, New York.